UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

        v.

$7,679.00 UNITED STATES CURRENCY,

                              Defendant.

**REPORT AND
RECOMMENDATION**

13-CV-727A

UNITED STATES OF AMERICA,

                              Plaintiff,

        v.

$15,104.00 UNITED STATES CURRENCY
  and ONE BLUE 2011 FORD F150 XLT,
  VIN: 1FTEX1CM5BFB76077,

                              Defendants.

**REPORT AND
RECOMMENDATION**

13-CV-1057A

## I.  INTRODUCTION

        The Hon. Richard J. Arcara has referred both Case No. 13-CV-727 (the

"First Case") and Case No. 13-CV-1057 (the "Second Case") to this Court under

28 U.S.C. § 636(b).  Pending before the Court is a motion by the Government in

each case for summary judgment and a final order of forfeiture against the three

*in rem* defendants.  (First Case Dkt. No. 54, Second Case Dkt. No. 50.)[1]  The

_____

[1] The Court will refer to the Government's motions as a collective singular motion, since they are
identical.

Government argues that the two sets of currency and the Ford pickup truck (the "Vehicle") facilitated drug trafficking and are proceeds of drug trafficking.  The Government submits a considerable amount of evidence to support the argument, including the arrest and guilty plea of claimant Andrew Fitch ("Fitch") for marijuana possession; the large amounts of currency and their location in suspicious places; a small quantity of marijuana in the Vehicle at the time of its seizure, confirmed by lab reports; the discovery of small amounts of marijuana and other psychoactive controlled substances in Fitch's apartment during execution of a 2013 local search warrant; and Fitch's alleged inability to document how he acquired the two sets of currency, whether by general income or specific legitimate transactions.  Fitch, who is *pro se*, counters the Government's motion in two ways.  Fitch asserts that the two sets of defendant currency came from a combination of a personal injury settlement, a sale of a jet boat, and ordinary income.  Fitch also highlights how the Government's factual case about drug trafficking rests on small quantities of marijuana and other psychoactive agents.  Fitch never has denied possessing small amounts of marijuana, arguing instead that the Government never has found him with controlled substances in amounts that are typical for drug trafficking.

The documents that Fitch has filed in both cases include a document that he titled a "Counter Motion for Summary Judgment."  (First Case Dkt. No. 57, Second Case Dkt. No. 53).  The document largely repeats the arguments that

Fitch made in many of his other filings.  Nonetheless, and for the sake of formality, the Court will construe Fitch's document as a cross-motion for summary judgment and has considered the Government's response.  (First Case Dkt. No. 59, Second Case Dkt. No. 55).

The Court has deemed the cross-motions submitted on papers under Rule 78(b) of the Federal Rules of Civil Procedure ("FRCP").  For the reasons below, the Court respectfully recommends denying the motions and setting the cases for trial.

## II. BACKGROUND

The Court described some of the facts of these twin cases in the Report and Recommendation that it issued for Fitch's motion to dismiss.  (First Case Dkt. No. 44, Second Case Dkt. No. 41.)  For the sake of completeness, the Court repeats those facts as needed and supplements them with additional information that the parties have placed in the record.

### A. Initial Arrest

Both cases originated with Fitch's arrest in Lockport, New York on February 23, 2013.  That day, Fitch was the sole driver and occupant of the Vehicle, a blue 2011 Ford F150 pickup truck.  Lockport Police Department officers pulled Fitch over when they allegedly observed him drive through a stop sign and turn without signaling.  When officers approached Fitch at his driver-side window, they noticed an odor of marijuana coming from him and the Vehicle.

3

At this point, the record is not clear as to how the next few events unfolded. Specifically, the record does not clarify whether the officers first acted on reasonable suspicion and concluded later that an arrest was necessary, or whether the officers decided immediately that they had probable cause to arrest Fitch and to search the vehicle incident to that arrest.

No matter how events played out exactly, Fitch's encounter with officers on the night of February 23, 2013 ended with his arrest, a search of his person, and a search of the Vehicle.  Officers charged him with misdemeanor possession of marijuana and two traffic violations.  Officers found a total of $7,679.48 on Fitch's person—$679.48 in his wallet and $7,000 hidden inside the front of his pants.  At his deposition, Fitch explained that he had money in the waistband of his pants because "[o]bviously any police officer whether you get pulled over with a gram of marijuana or not is going to assume that the funds came from that.  So I just—I put it in there."  (Dkt. No. 54-3 at 39.)[2]  A search of the Vehicle yielded a little over two ounces of marijuana in a clear plastic baggie, a clear glass jar containing marijuana, a plastic cup containing a black hardened substance, a marijuana grinder, and four cellular telephones.  Fitch allegedly told officers during a post-arrest interview that the currency found on his person came from a settlement of a personal injury case.  At Fitch's deposition, the following

---

[2] For the sake of brevity, the docket numbers cited in this Background section all refer to the First Case unless otherwise noted.

exchange occurred concerning the ownership of the cellular telephones found in

the Vehicle:

> Q. Why would you have four cell phones?  What do you need four
>    cell phones for?  Nobody needs four cell phones, but yes, I had
>    four cell phones apparently in this information, that's what it says?
>
> Q. Are you denying that this information—
>
> A. I can't say that those four cell phones were mine, but I can say
>    that obviously they were in my vehicle.  If there's any information
>    leading to say that it was specifically mine, then I'd like to see that
>    information.
>
> Q. You have the information—
>
> A. It just says that it was in my vehicle.  It doesn't say that it was
>    actually mine.
>
> Q. Okay.
>
> A. Or tied to me in any kind of fashion—
>
> Q. So you walk around with other strangers' cell phones—
>
> A. No, I don't walk around, ma'am.  This was in a vehicle.
>
> Q. Do you have the habit of traveling about with cell phones that
>    belong to other people?
>
> A. If there were other people that were in my vehicle, it's possible.
>
> Q. Who was in the vehicle?
>
> A. There could have been many people in my vehicle, ma'am.
>
> Q. Who?
>
> A. My girlfriend, friends, family.
>
> Q. Okay, and they leave their cell phones there and you don't call
>    them up to alert them to the fact that they left their cell phones?
>    Most people can't survive ten minutes without their cell phone.

A. I guess that's really irrelevant, I guess.

(Dkt. No. 54-3 at 47.)

On February 28, 2013, a canine search of the currency found on Fitch led to a positive alert for the presence of the odor of narcotics.  On July 17, 2013, Fitch pled guilty to the marijuana charge and was sentenced to a conditional discharge.  On March 3, 2016, the Government filed an addendum to the pending motion containing laboratory confirmation that the Vehicle contained marijuana and two other psychoactive controlled substances at the traffic stop and during the execution of the seizure warrant described below.  (*See generally* Dkt. No. 58.)

### B. Federal Seizure Warrant and State Search Warrant

The next set of events in the present cases occurred a few months later, in April and May 2013.  On April 22, 2013, Magistrate Judge Leslie Foschio issued a seizure warrant for the Vehicle.  Federal agents executed the warrant on May 21, 2013, stopping Fitch shortly after he started driving away from his residence. After searching the Vehicle, agents recovered $15,104.00 in currency, 4.43 ounces of marijuana, three more cellular telephones, and two cellular telephone phone batteries.  "The defendant currency was found wrapped in plastic and secreted within a shoe box which was also located in the bed of the defendant vehicle, a short distance away from the marijuana.  The majority of the defendant currency was found to be in smaller denominations, including 481 twenties."

(Dkt. No. 54-1 at 5.)  Also on May 21, 2013, local law enforcement officers executed a state search warrant for Fitch's residence.  (Dkt. No. 54-6 at 14–17.) "There officers recovered a quantity of marijuana, a glass baking pan containing concentrated cannabis oil, a small tin containing a white rock like substance and a purple chunk like substance, several assault rifles, ammunition and a ballistic vest.  In the basement, officers discovered equipment they recognized as equipment commonly used in an indoor marijuana grow operation, including grow lights and plant food." (*Id.* at 5.)  Another state search warrant appears to have been executed at Fitch's residence on November 3, 2015, yielding over 10 pounds of marijuana, drug paraphernalia, and over $70,000 cash.  (Dkt. No. 54-7 at 12–15.)  New state charges resulted, but the final disposition of those charges is not clear.

### C. Fitch's Explanations for the Seized Assets

During the course of discovery for the present cases, the parties reviewed various financial transactions in which Fitch had engaged over the previous several years.  Fitch also offered three types of explanations for his ownership of the defendant assets: legitimate income including from legal settlements, and a sale of a jet boat.

With respect to income, Fitch has told the Government that he ran a T-shirt making business.  The T-shirt business allegedly brought Fitch about $22,000 over a three-year period, between 2011 and 2013.  In 2014, Fitch started a

stump grinding business called Stubborn Stumps.  (Dkt. No. 54-4 at 30.)  Fitch

employs himself only and spent money on a grinding machine.  Fitch claimed

that the business generated about $25,000; the deposition transcript is not clear

about the timeframe for that income.  (*See* Dkt. No. 54-3 at 9.)  Fitch also

received income from settlements of personal injury and possibly other cases.

Fitch explained at his deposition that he received at least $100,000 and possibly

over $130,000 in total settlement funds.  (*See id.* at 8, 11; *see also* Dkt. No. 54-6

at 24, 45–57, 74–76; Dkt. No. 54-8 at 8, 27; Dkt. No. 54-9 at 37.)  Fitch stated

that he bought a house for about $22,000 around 2011, using settlement funds;

his response to interrogatories clarifies that a combination of a mortgage and

settlement funds paid for the house.  (Dkt. No. 54-6 at 22.)  The record seems to

confirm that Fitch bought a house on October 28, 2009 and took out a mortgage

for it. (Dkt. No. 54-4 at 6, 8–9.)  Fitch used settlement funds also to purchase the

Vehicle.  For a prior marijuana charge in Illinois in 2012, Fitch's parents paid an

unspecified amount for legal representation, thereby providing indirect income.

When asked at his deposition whether he sold marijuana or cocaine in

2012, 2013, or the present time, Fitch said no.  Fitch denied receiving shipments

of marijuana within Shop-Vac™ style vacuum cleaners and denied owning any of

those machines.  As to why he kept so much money as cash, Fitch explained

that "I didn't want my cash in the bank . . . . I just don't believe in a bank.  Plus if

8

you want to purchase things, it's a lot easier to negotiate with cash."  (Dkt. No. 54-3 at 50.)

With respect to the sale of a jet boat, Fitch offered the following details. Fitch purchased the jet boat from someone named Nate Vanderbeck and registered it with the Department of Motor Vehicles but never used it due to mechanical problems.  Fitch never had the jet boat insured.  A woman named Andrea Messina eventually purchased the jet boat for $7,000.  The jet boat sold the day before Fitch's arrest and a handwritten bill of sale was produced.  (Dkt. No. 54-4 at 47.)  The Government has attempted to challenge Fitch's story by showing that a comparable jet boat would have been worth several thousand dollars less.  (*See* Dkt. No. 54-4 at 49.)  Law enforcement agents also searched public records for people in Western New York named Andrea Messina.  Agents found two women with that name.  Each woman furnished an affidavit denying having anything to do with Fitch or his jet boat.  (Dkt. No. 54-9 at 6–7.)  The record is not clear as to whether Fitch ever specified where the purchaser of the jet boat resided.

The Government has included in the record other documents that do not seem to bear directly on Fitch's claims but perhaps bear on his credibility.  The documents include: a mortgage discharged in 2010 (Dkt. No. 54-4 at 9–10); business documents from 2009 and 2013 concerning an entity called Certified Investments (*id.* at 12–13); domestic violence and criminal matters concerning

Fitch's girlfriend (*id.* at 24–27); various bank statements that would tend to show that Fitch had limited regular income (Dkt. No. 54-9 at 27–37; Dkt. Nos. 54-10 to 54-16); and invoices for legal representation (Dkt. No. 54-16 at 1–27).

### D. The Cases Generally

The Government filed verified complaints for the First Case on July 12, 2013 and the Second Case on October 18, 2013.  The Government's cause of action for the First Case was simple: "[T]here is cause to believe by a preponderance of the evidence that the defendant currency was furnished, or intended to be furnished in exchange for a controlled substance, and/or had otherwise been used to facilitate a violation of Title 21, United States Code, Subchapter I of Chapter 13, Section 801 *et. seq.* and is subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(6)."  (First Case Dkt. No. 1 at 7.)  Fitch filed a verified claim for the First Case on August 29, 2013 and a verified answer on September 19, 2013.  (First Case Dkt. Nos. 6, 9.)  In both documents, Fitch denied that the Government had an appropriate basis to make a seizure and asserted that he was an innocent owner of the defendant currency. The Government's cause of action for the Second Case was nearly identical: "[T]here is cause to believe by a preponderance of the evidence that the defendant vehicle was used, or intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of a controlled substance, and/or were the proceeds traceable to such exchanges in

violation of Title 21, United States Code, Subchapter I of Chapter 13, Section 801 *et. seq.* and is subject to forfeiture pursuant to Title 21, United States Code, Sections 881 (a)(4) and (6).  The defendant currency was furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of Title 21, United States Code, Subchapter I of Chapter 13, Section 801 *et. seq.*, and is subject to forfeiture pursuant to Title 21, United States Code, Section 881 (a)(6)."  (Second Case Dkt. No. 1 at 7–8.)  In his verified claim and verified answer, both filed on November 20, 2013, Fitch again asserted himself as an innocent owner of the defendant assets and denied that the Government had an appropriate basis to seize the property.  (*See generally* Second Case Dkt. Nos. 5, 6.)

Both cases have survived Fitch's motions to dismiss and have proceeded through discovery.

### E. The Pending Motions

The Government takes two main approaches to its request for summary judgment.  The Government first marshals direct and circumstantial evidence concerning the defendant assets.  With respect to the Vehicle, the Government emphasizes that reasonable suspicion supported the initial traffic stop and that subsequent events led to drug-related items in the Vehicle.  Law enforcement agents eventually recovered a large amount of cash, a quantity of marijuana, marijuana residue, seven cellular telephones, and a marijuana grinder from the

11

Vehicle.  The items, when considered together, are suspiciously consistent with items that law enforcement agents seize from drug traffickers.  According to the Government, the items become even more suspicious considering that two searches of Fitch's residence after the initial vehicle stop yielded significant evidence of a marijuana grow operation.  The Government concludes that no reasonable jury would dispute that the Vehicle facilitated drug trafficking and that the defendant currency constituted drug proceeds.  Next, the Government spends considerable effort trying to disprove Fitch's proffered explanations for the bunches of currency that it seized.  The Government has submitted documentation indicating that Fitch has had, at most, a sporadic income the last several years.  The Government also has obtained affidavits in an attempt to cast doubt on Fitch's story about the jet boat.  In fact, the Government makes an explicit argument that Fitch's credibility is a big reason why summary judgment is appropriate.  "Simply put, claimant's allegation regarding the source of $7,000 of the $7,679.00 defendant currency as being from the sale of a boat is not credible. This Court must assess the evidence as well as claimant's credibility regarding the legitimacy of the $7,000 as being proceeds from a sale of the boat as well as all other aspects of his claims."  (First Case Dkt. No. 55 at 14.)  "Additionally, his explanation regarding the shop vac appears to be another falsity.  When asked during his deposition if he had ever received shipments of marijuana hidden in shop-vacs, claimant denied that he did.  (Exhibit A at p. 8).  When asked about

12

the multiple shop-vacs found within the residence and basement of his home, claimant testified that the landlord had flooding problems in the basement and used the shop vacs to clean up the water.  (Appendix A at pp. 67-68).  However, Mark Adams, the landlord denied having any problems with flooding in his basement, stated that there were drain tiles and a sump pump in event of flooding.  Additionally, the landlord denied owning any shop-vacs." (*Id*. at 20–21.)

Fitch makes essentially the same arguments both in opposition to the Government's motion and in support of his cross-motion.  Fitch maintains his explanations that he received a considerable amount of income in recent years from several legal settlements.  Fitch argues that, whatever law enforcement officers may have found during the searches of his residence, those searches occurred after the original traffic stop and have no direct link to the Vehicle.  Fitch also stands by his narrative that the $7,000 seized from his person during the initial traffic stop came from the sale of a jet boat to a woman named Andrea Messina.  To the extent that the Government has attempted to find someone of that name who was involved in the transaction, Fitch in effect rejects the Government's efforts as inconclusive.  Finally, Fitch questions the proportionality of the Government's requested forfeiture to the alleged offenses directly connected to the defendant assets (reprinted verbatim):

> There has never been any evidence nor statements submitted by the government or witnesses prior to or during this so called investigation to warrant anything beyond the charge mentioned. Because the truck had no lein?  And I was in possesion of 2 ounces of marijuana?  Both incidence Feb and May of 2013 combined a total of about 7ounces of marijuana, without ever having any scales or eviedence of sales.  The street value is less than a $1000 dollars in both combined situations. I dont see that as enough evidence to assume possesion of someone's vehicle legally?

(First Case Dkt. No. 57 at 3–4; Second Case Dkt. No. 53 at 3–4.)

## III. DISCUSSION

### A. Summary Judgment Generally

The general standard for summary judgment is straightforward.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP 56(a).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and

14

draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

While applying the general principles outlined above, the Court will grant Fitch some procedural leeway to accommodate his *pro se* status.[3] "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants.  The rationale underlying this rule is that a *pro se* litigant generally lacks both legal training and experience and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection . . . . The solicitude afforded to *pro se* litigants takes a variety of forms. It most often consists of liberal construction of pleadings, motion papers, and appellate briefs." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (citations omitted).  "At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest; that we should not excuse frivolous or vexatious filings by *pro se* litigants; and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . . Under the circumstances, we must all do

---

[3] As it did with Fitch's motion to dismiss, the Court is omitting lengthy and somewhat rambling information that Fitch has filed indicating a contentious relationship with former counsel.

our best to gauge what is appropriate." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (internal quotation marks and citations omitted).

The civil-forfeiture context of the present cases informs the Court as to what facts in the record might be "material."  A review of materiality begins with what the Government's ultimate burden would be at trial.  "In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property—(1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture; (2) the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture; and (3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."  18 U.S.C. § 983(c) (Westlaw 2016).  "Under the substantial connection test, the property either must be used or intended to be used to commit a crime, or must facilitate the commission of a crime.  At minimum, the property must have more than an incidental or fortuitous connection to criminal activity."  *U.S. v. Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990).

Section 983(c)(3) would apply to the Vehicle.  *See also* 21 U.S.C. § 881(a)(4) (subjecting to forfeiture "[a]ll conveyances, including aircraft, vehicles,

16

or vessels, which are used, or are intended for use, to transport, or in any

manner to facilitate the transportation, sale, receipt, possession, or concealment

of property described in paragraph (1), (2), or (9)"); *id.* § 881(a)(1) (subjecting to

forfeiture "[a]ll controlled substances which have been manufactured, distributed,

dispensed, or acquired in violation of this subchapter").).  "The courts have

uniformly held that a vehicle is subject to forfeiture no matter how small the

quantity of contraband found."  *U.S. v. One 1976 Porsche 911S, Vin 911-*

*6200323, California License 090 NXC*, 670 F.2d 810, 812 (9th Cir. 1979)

(citations omitted); *see also U.S. v. One 1974 Cadillac Eldorado Sedan, Serial*

*No. 6L47S4Q407966*, 548 F.2d 421, 425 (2d Cir. 1977) (noting that "the

transportation of any quantity of drugs however minute is admittedly sufficient to

merit the forfeiture of the vehicle").  While any amount of contraband technically

can make a vehicle subject to forfeiture, however, too great a mismatch between

a quantity of contraband and the remedy of forfeiture can raise Eighth

Amendment concerns.  "The claimant under subsection (a)(4) may petition the

court to determine whether the forfeiture was constitutionally excessive.  In

making this determination, the court shall compare the forfeiture to the gravity of

the offense giving rise to the forfeiture.  The claimant shall have the burden of

establishing that the forfeiture is grossly disproportional by a preponderance of

the evidence at a hearing conducted by the court without a jury.  If the court finds

that the forfeiture is grossly disproportional to the offense it shall reduce or

17

eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines

Clause of the Eighth Amendment of the Constitution." 18 U.S.C. § 983(g). While

written specifically in the context of forfeiture of real property, the following

factors guide an inquiry into excessiveness: "(1) the harshness, or gross

disproportionality, of the forfeiture in comparison to the gravity of the offense,

giving due regard to (a) the offense committed and its relation to other criminal

activity, (b) whether the claimant falls within the class of persons for whom the

statute was designed, (c) the punishments available, and (d) the harm caused by

the claimant's conduct; (2) the nexus between the property and the criminal

offenses, including the deliberate nature of the use and the temporal and spatial

extent of the use; and (3) the culpability of each claimant." *von Hofe v. U.S.*, 492

F.3d 175, 186 (2d Cir. 2007) (citations omitted).

Section 983(c)(1) would apply to the defendant currency, but a little

differently than it would to the Vehicle. Section 983(c)(1) here would work with

21 U.S.C. § 881(a)(6), which subjects to forfeiture "[a]ll moneys, negotiable

instruments, securities, or other things of value furnished or intended to be

furnished by any person in exchange for a controlled substance or listed

chemical in violation of this subchapter, all proceeds traceable to such an

exchange, and all moneys, negotiable instruments, and securities used or

intended to be used to facilitate any violation of this subchapter." "[W]here, as

here, the Government seeks forfeiture pursuant to 21 U.S.C. § 881(a)(6) on a

theory that the property constitutes proceeds 'traceable to' an exchange for narcotics, it need not prove that there is a substantial connection between the property and any specific drug transaction.  Rather, the Government may prove more generally, based on a totality of the circumstances, that the property is substantially connected to narcotics trafficking."  *U.S. v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N-01967*, No. 08-CV-6287L, 2014 WL 2575308, at *2 (W.D.N.Y. June 9, 2014) (Larimer, *J.*) (internal quotation marks and citations omitted).

As the Court noted, the above criteria pertain to the Government's ultimate burden at trial.  Adapting the above criteria to the summary-judgment posture, the Government needs to demonstrate right now that no reasonable jury would disagree 1) that the Vehicle had a substantial connection to criminal activity and 2) that the defendant currency had a substantial connection to narcotics trafficking generally, if not to any particular transaction.  For his cross-motion, Fitch's burden is the inverse of the Government's.  Fitch needs to demonstrate that no reasonable jury could find the Vehicle or the Defendant currency subject to forfeiture.

### B. Documentation and Fitch's Credibility

Clarifying the parties' burdens for the pending motions reveals that a number of important factual questions remain unanswered in the record.  With respect to the Vehicle, its only connection to criminal activity comes from the

original traffic stop and the execution of the seizure warrant.  The searches of Fitch's residence came after the traffic stop, with the second one coming after the seizure of the Vehicle.  The Government has submitted only inferential evidence of Fitch using the Vehicle to arrange any drug trafficking.  The available evidence concerning the Vehicle requires the Government to take its argument for forfeiture down only two possible paths.  The Government could invoke the principle, cited in the case law above, that the small amounts of controlled substances found in the Vehicle at the traffic stop and seizure in themselves constitute criminal possession regardless of quantity.  The criminal possession would create a direct and substantial connection to criminal activity but then would require fact-finding about the "gravity of the offense" and the other *von Hofe* factors to allow for a proper analysis under 18 U.S.C. § 983(g).  *Cf. U.S. v. All Right, Title & Interest in Real Prop. & Appurtenances Thereto Known as 35-37 E. Broadway, New York, New York 10002 Listed as Block 280, Lot 42 in Office of Cty. Clerk & Register of New York Cty., New York*, No. 12 CIV. 4034 HB, 2013 WL 4006073, at *4 (S.D.N.Y. Aug. 6, 2013) (denying summary judgment "as to the disproportionality of forfeiture" and setting a fact-finding hearing); *U.S. v. Real Prop. & Premises Known as 5985 Fly Hollow Rd.*, No. 1:03-0015, 2006 WL 334670, at *4 (M.D. Tenn. Feb. 13, 2006) ("The extent of [claimant's] property involvement in growing illegal drugs is undisputed.  The amount of marijuana [that] was actually seized is sharply disputed.  The amount of marijuana

represents material disputes, given the different amounts in various reports. These factual disputes are critical to the proportionality issue."). The Court cannot ignore the need for this fact-finding since Fitch, however inartfully, has invoked the substance of Section 983(g) if not the actual statutory language. Even if the Court ultimately conducted a Section 983(g) hearing after any seizure and without a jury, having a jury weigh in on background circumstances setting up the hearing would be of immense help. Alternatively, the Government could use the totality of the controlled substances and other items found in the Vehicle as a lead-in to a presentation about more extensive criminal activity, but then the Government would have to demonstrate to a fact-finder what that more extensive criminal activity was. Either way, summary judgment for either party with respect to the Vehicle cuts off the ongoing factual development of the present cases too drastically.

Important factual questions similarly surround the defendant currency. The Government has attacked Fitch's credibility furiously to show that he has limited regular income to support aspects of his lifestyle and that some of his explanations for certain transactions do not survive scrutiny. To be sure, the Court is not naïve about what a reasonable fact-finder at trial might conclude about a man who apparently needs seven different cellular telephones and $7,000 in his pants, two years before an alleged marijuana grow operation is found running at his residence. That said, though, Fitch's proffered explanations

of his finances are not "categorically false." *Cf. U.S. v. $10,560.00 U.S. Currency*, No. CV-08-033-LJQ, 2009 WL 854637, at *3 (E.D. Wash. Mar. 30, 2009) ("Mr. Fausett disputes that the money was intended for any drug-related use, but was to be used to purchase a boat.  The Government has not proven that this explanation is categorically false; rather, it relies on circumstantial evidence to suggest that the money was to be or had been used in such a manner as to be subject to forfeiture under 21 U .S.C. § 881(a)(6).  A fact finder, when considering the evidence in the light most favorable to Mr. Fausett, could determine that the currency is not subject to forfeiture because it was being used for a legitimate, lawful purpose.").  The record documents that Fitch indeed had at least some litigation in his life that led to fairly significant amounts of settlement proceeds.  The record shows that Fitch had at least a little income from various businesses that he started and from family support.  That the Government found two women in Western New York named Andrea Messina, and that each of these women denied having anything to do with Fitch, is interesting but not dispositive of the proffered story behind the jet boat and its proceeds.  *See U.S. v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 79 (2d Cir. 2002) ("It must be remembered, however, that in a civil forfeiture action the *government* is the plaintiff, and it is the government's right to forfeiture that is the sole cause of action adjudicated.  If the government fails to meet its burden of proof (formerly probable cause, now preponderance), the claimant need not produce any

22

evidence at all—i.e., the claimant has no 'case' that he must present or 'elements' to which he bears the burden of proof."). In all, while there is no way that Fitch can prevail on his cross-motion under the circumstances, he has made just enough of a showing that judgment for the Government right now would come too close to the type of good-faith or credibility determination that is not permitted with a summary-judgment motion. *Cf. Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 353 (2d Cir. 1981) (citation omitted) ("Subjective issues such as good faith are singularly inappropriate for determination on summary judgment."); *U.S. v. $49,766.29 U.S. Currency*, No. 01-CV-0191E(SC), 2003 WL 21383277, at *5 (W.D.N.Y. Jan. 22, 2003) (Elfvin, *J.*) ("Second, the government's argument that [claimant]'s deposition testimony regarding the source of the currency 'is simply unbelievable and does not warrant credibility' is without merit. It is not the role of this Court to make credibility determinations on a summary judgment motion."). The Government's case, which admittedly looks fairly strong, will have to await submission to a fact-finder at trial.[4]

---

[4] The Court again takes no position on the Government's submission of a dog sniff as evidence linking the defendant currency to drug activity. *See, e.g., U.S. v. Six Hundred Thirty-Nine Thousand Five Hundred & Fifty-Eight Dollars ($639,558) In U.S. Currency*, 955 F.2d 712, 714 n.2 (D.C. Cir. 1992) (commenting on the prevalence of currency tainted with drug residue); *U.S. v. $60,020.00 U.S. Currency*, 41 F. Supp. 3d 277, 288 (W.D.N.Y. 2011) (Feldman, *M.J.*) (reviewing cases and noting that "this Court is aware of differing views as to the evidentiary significance of a dog alert to United States currency"). At this point, the Court recommends deferring to the trial judge as to how a fact-finder should assess such evidence.

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying the parties' cross-motions for summary judgment.  (First Case Dkt. No. 54, Second Case Dkt. No. 50; First Case Dkt. No. 57, Second Case Dkt. No. 53.)

Upon adoption of this Report and Recommendation, both cases will be ready for trial.  *See U.S. v. One 1976 Mercedes Benz 280S, Serial No. 11602012072193*, 618 F.2d 453, 469 (7th Cir. 1980) ("[I]n the particular type of proceeding here involved, the infusion of the earthy common sense of a jury might upon occasion mitigate appropriately the harsh impact sometimes characteristic of in rem procedure."); *U.S. v. U.S. Currency in sum of Ninety Seven Thousand Two Hundred Fifty-Three Dollars ($97,253.00)*, No. 95- CV-3982 JG, 1999 WL 84122, at *2 (E.D.N.Y. Feb. 11, 1999) (finding that "claimants in civil forfeiture actions have the right to a trial by jury").  Up to this point, neither side has made a demand for a jury trial.  The Court reminds the parties that they may make a motion under FRCP 39(b) to Judge Arcara to "order a jury trial on any issue for which a jury might have been demanded."

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent, on the date below, to counsel for the Government by electronic filing on the date below; the Court will mail on the date below a hard copy of this Report and Recommendation to Fitch, via first-class mail.  Any objections to this Report and

Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

_/s Hugh B. Scott_____

HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: March 31, 2016